**418**

UNITED STATES, Appellee,

v.

Mack A. MAYFIELD, Second
Lieutenant, U.S. Army,
Appellant.

No. 45,459.
CM 442042.

U.S. Court of Military Appeals.

March 24, 1986.

For Appellant: *Colonel William G. Eckhardt, Colonel R. Rex Brookshire, II, Major Lawrence F. Klar, Captain Gunther O. Carrle* (on brief); *Lieutenant Colonel William P. Heaston, Major Robert C. Rhodes, Major Edwin D. Selby.*

For Appellee: *Lieutenant Colonel John T. Edwards, Captain Glenn D. Gillett, Captain David A. Brown* (on brief).

### Opinion of the Court

EVERETT, Chief Judge:

Contrary to his pleas, appellant was convicted by general court-martial of violating Article 134 of the Uniform Code of Military Justice, 10 U.S.C. § 934, by wrongfully fraternizing with two enlisted women and by committing an indecent assault on one of them. The findings and the sentence to dismissal were approved by the convening authority and were affirmed by the Court of Military Review.

We granted review of this issue raised by appellant:

WHETHER THE EVIDENCE WAS INSUFFICIENT AS A MATTER OF LAW TO SUSTAIN APPELLANT'S CONVICTION FOR WRONGFUL FRATERNIZATION WITH PRIVATE GRIFFIN.

In addition we specified the following issue:

WHETHER THE FINDINGS OF GUILTY OF SPECIFICATION 1, CHARGE 1 (FRATERNIZATION BY SEXUAL INTERCOURSE) ARE INCONSISTENT WITH THE FINDINGS OF GUILTY OF SPECIFICATION 5,

## CHARGE 1 (WHICH ALLEGES AN INDECENT ASSAULT).

### I

### A

Mayfield's claim that the Government's evidence was insufficient is made with respect to a specification alleging that he did, on or about 3 July 1981, 10 July 1981 and 11 July 1981 at Fort Lee, Virginia, an installation under military control, wrongfully fraternize on terms of military equality with an enlisted person, Private (E–2) Elita R. Griffin, a woman not his wife, by asking said Private (E–2) Elita R. Griffin for a date on three occasions, and that under the circumstances, such conduct was prejudicial to good order and discipline in the armed forces.

The Government's evidence showed that Mayfield, a recently commissioned second lieutenant, was assigned to duty as an "acting platoon leader" in a company composed of students. All the women in the company were assigned to a platoon commanded by a woman officer; and appellant's platoon consisted of males.

Private Griffin testified that on three occasions Mayfield had asked her for a date. The first time was while Mayfield was selling tickets to a command-sponsored excursion to an amusement park. Then, about a week later Private Griffin saw appellant in the area of her barracks. She attempted to avoid him by leaving the building from another exit; but he noticed her, took her aside, and again asked her to go out with him. Another female soldier accompanying Griffin saw appellant on that occasion and remarked on his status as an officer. The third incident also occurred in the company area: Griffin had been using a public telephone when Mayfield drove up in his car, asked her to come over to the vehicle, and again requested a date. On this occasion, as before, she refused. Griffin admitted that appellant had been polite to her at all times; he had not used his rank to force her to accompany him against her wishes; and the conversations had been brief, lasting only about 3 to 5 minutes on each occasion.

Testifying in his own defense, Mayfield denied that he had approached Private Griffin to ask for a date. He asserted that his conversations with her had been casual and that he had made no effort to encourage her to go out with him.

After appellant had been examined by counsel, the members proposed certain questions to be asked by the military judge. Most significant among these was an inquiry as to whether Mayfield had received instruction as to "the Army's policy on fraternization or associating with enlisted personnel." Appellant responded that he had attended such a class and that his company commander had given him a directive of some description.[1] He stated that when he had gone to the unit, he had

---

1. Appendix B to appellant's final brief in this Court consists of a "Policy Record" that had been issued, effective April 21, 1981, by the commanding general at Fort Lee "to provide guidance for dealing with the subject of fraternization." According to this document, which itself purported to be based on Army Regulation 600–20,

Fraternization is any nonprofessional, social relationship of a personal nature between two or more persons. It connotes a relationship outside of any duty association. Included are the following specific activities not intended to be exclusive but suggestive of the types of conduct addressed by the term fraternization: drinking alcoholic beverages together, playing cards or gambling together, going to private homes or clubs together, and *dating or engaging in sexual activities.*

\* \* \* \* \* \*

Fraternization, as defined above, between permanent party personnel and trainees, NCO's (E5 and above to include acting sergeants) and junior enlisted personnel (E4 and below), or officers and enlisted personnel of all grades, which involves or gives the appearance of partiality, preferential treatment, or the improper use of rank or position for personal gain, or is prejudicial to good order, discipline, and high unit morale will not be tolerated.

\* \* \* \* \* \*

Violations of this policy *may subject offenders to punitive action under the Uniform Code of Military Justice* or adverse administrative action under appropriate regulations. (Emphasis added.)

been advised that he could converse with the trainees but "just don't take them out or take them home."

On further cross-examination, appellant admitted that he had attended a briefing by the brigade commander on fraternization. This included about 1 hour of instruction and some role-playing as to situations to be avoided. Again he admitted that this session had included an admonition against dating the trainees he was to lead. Although Mayfield expressed his personal feeling that nothing was wrong with such activity, he was aware of an official prohibition on such conduct. Moreover, when cross-examined on the events underlying two specifications involving sexual activity with another trainee, appellant stated that he had attempted to avoid being seen with her because "I knew she was a AIT student, I didn't want to get caught being fraternization [sic]."

### B

In *United States v. Johanns*, 17 M.J. 862 (A.F.C.M.R.1983), the Air Force Court of Military Review considered the legality of a male officer's conviction under Article 133, UCMJ, 10 U.S.C. § 933, for fraternizing with enlisted females by having "consensual, private, nondeviate" sexual intercourse with them, when the "accused was neither the commander nor supervisor of any of these enlisted members and their respective relationships were not publicized." 17 M.J. at 864. Because it found that the Air Force had no clear-cut custom which prohibited such activity, the court reversed the findings of guilty.

On the basis of the determination by the court below, this Court agreed that the findings of guilty properly had been set aside. *United States v. Johanns*, 20 M.J. 155 (C.M.A.1985). Central to our decision was the premise that fundamental fairness and fifth-amendment due process require a servicemember to be on notice as to what conduct is forbidden before he may be prosecuted under the first two clauses of Article 134 or, if an officer, under Article 133 of the Code. Absent a custom or regulation forbidding his conduct, Johanns had no standard by which to gauge and to direct his actions.

Appellant, however, was not prosecuted for violating an Army custom whereunder he could not engage in social activities with Private Griffin. Instead, the Government offered evidence that Mayfield had been specifically informed as to which relationships he should avoid with trainees subordinate to him. Indeed, appellant's own testimony shows that he was well aware of the local policy against dating trainees—a policy which would clearly include requesting trainees for dates. Even though Mayfield may have believed that such limitations on his amorous activity were inappropriate, he knew that they existed.

Furthermore, unlike Johanns, who unsuccessfully sought clear guidance as to the permissibility of his relationships with enlisted females, appellant made no inquiry in this regard—obviously because he already had clear notice that his intended conduct would violate the standards established by his superiors. Even at trial, the defense did not claim appellant believed that his overtures to Private Griffin were permissible. Instead, he denied that he had ever asked her for a date.

### C

Appellant also contends that, even if he was aware that his conduct constituted "fraternization," he is not subject to criminal sanctions: His premise is that his acts neither detracted from his role as an officer nor prejudiced good order and discipline because, as Private Griffin conceded, he had been polite at all times and had done nothing to interfere with her performance of duty.

We have previously observed that "not every social contact between an officer and an enlisted man is or even can reasonably be prohibited." *United States v. Pitasi*, 20 U.S.C.M.A. 601, 608, 44 C.M.R. 31, 38 (1971); *see also United States v. Johanns, supra* at 161; *United States v. Free*, 14

C.M.R. 466 (N.B.R.1953). However, that observation has little relevance to the present facts. Private Griffin was a trainee who had recently entered the Army. Although she was not directly under Mayfield's command, she served in another platoon in the same company, and apparently some of his supervisory and counseling responsibilities extended to all the trainees in the company. Indeed, appellant was engaged in the performance of his duties when he first asked Private Griffin for a date. His status as an officer was known to her and to other members of her platoon. In fact, had appellant not held the position that he occupied, Private Griffin could—and would—have more swiftly and emphatically discouraged his attentions, which she had neither sought nor encouraged.

Because of their typical lack of experience and maturity, trainees in the armed forces are to some extent at the mercy of the officers and noncommissioned officers who supervise them. In recognition of this circumstance and of the potential for disruption of good order and discipline if their superiors take advantage of the opportunity to victimize trainees, many training commands have issued directives concerning fraternization with trainees. Indeed, as appellant knew, a policy prohibiting fraternization with trainees had been promulgated by his own commander.

Under these circumstances we conclude that the trier of fact had an ample basis to decide that appellant's activity—although not specifically prohibited by the Code or the Manual for Courts-Martial, United States, 1969 (Revised edition)—directly and palpably prejudiced good order and discipline and so was punishable under Article 134. *Cf. United States v. Sadinsky*, 14 U.S.C.M.A. 563, 34 C.M.R. 343 (1964). Therefore, the finding of guilty as to specification 3 of Charge I may be affirmed. *United States v. Grandy*, 11 M.J. 270, 275 (C.M.A.1981); *United States v. Arias*, 3 M.J. 436 (C.M.A.1977).

## II

Specification 1 of Charge I alleged that Mayfield had fraternized with Private Gabrielle Melissa Cheche by engaging in sexual intercourse with her; and specification 5 alleged that, at the same time and place, he had committed an indecent assault on her by inserting his penis in her vagina. Appellant contends that the two specifications are inconsistent because fraternization signifies consent, while assault requires the absence of consent.

■ Inconsistency in allegations—even if it exists—is permissible to allow for contingencies of proof. Because consent would have been a defense to the indecent assault but not to the fraternization, the Government could properly allege both offenses. The exigencies of trial no longer exist, however, so we must decide whether the findings of guilty on both specifications may coexist.[2]

Often, a nonconsensual relationship between a military superior and subordinate, which might be prosecuted as "fraternization" under Article 133 or 134, is subject to prosecution on some other basis, as well. For example, it may be an assault, extortion, or cruelty and maltreatment, *see* Articles 128, 127, or 93, UCMJ, 10 U.S.C. §§ 928, 927, 893, respectively. This does not detract, however, from the fact that such acts also constitute fraternization.

To the extent that "fraternization" is independently subject to prosecution, we perceive no reason why consent should be viewed as an element of the offense or why the absence of consent should be considered a defense. Indeed, even in the current Manual, there is no suggestion at all that consent plays such a role in the offense of fraternization. *See* para. 83*b*, Part IV, Manual for Courts-Martial, United States, 1984. A relationship between a superior and subordinate which is unwelcome to, or forced upon, the subordinate can be as damaging to morale and discipline as

---

**2.** The issue is somewhat similar to that of whether an accused can be convicted both of adultery and of rape with respect to the same act of sexual intercourse.

one entered into voluntarily. Indeed, one reason for forbidding certain relationships between a superior and his subordinates is that—because of the rank or position of the superior—the relationships often are forced upon the subordinates and so adversely affect their morale and diminish their respect for the superior. Even when amorous attentions reach the level of an assault, the Government is free to prosecute them as fraternization in order to reflect the real gravamen of the crime. Accordingly, we perceive no inconsistency here between the allegation of fraternization by sexual intercourse, on the one hand, and indecent assault, on the other.

■ However, in the present case, to allow the specification of fraternization to stand would violate the policy implicit in paragraph 26c of the 1969 Manual for Courts-Martial. Unless the sexual intercourse with Private Cheche was involuntary—in which event it could properly have been charged as rape—it was a minor offense in relation to the indecent assault on her, for which a maximum punishment of confinement at hard labor for 5 years was authorized, *see* para. 127c, Table of Maximum Punishments, 1969 Manual, *supra.* Moreover, instead of explaining the more serious charge, here the finding of guilty on the fraternization specification only generated confusion—although Mayfield could not have been prejudiced thereby in his sentence.

### III

The decision of the United States Army Court of Military Review is reversed as to specification 1 of Charge I. The finding of guilty thereon is set aside and that specification is dismissed. In all other respects, the decision below is affirmed.

COX, Judge (concurring):

I concur. *See also* my separate opinions in *United States v. Scott,* 21 M.J. 345, 350 (C.M.A.1986), and *United States v. Johanns,* 20 M.J. 155, 161 (C.M.A.1985).